In Motley’s case, the opinion of the Court was delivered by
Whitner, J.
The prisoner was indicted, with two other persons, William Blackledge and Derrill Rowell, for the murder of a slave, and, having been convicted, at the last Fall Term for Colleton District, submits a motion to this Court for a new trial on grounds which I will consider in the order presented in the brief:
First, because it was not in evidence that the negro Joe was a slave.
The indictment charged the murder of a slave named Joe, the property of a person unknown. This being a proceeding under the statute, it was a material allegation that the deceased was a slave, and hence proof of the fact was also necessary.
*334 The deceased, when living, was seen only by witnesses to whom he was a stranger; his remains when found afforded no means of recognition by inspection. The evidence relied on was that “ Joe was a black negro, hair very kinky, about 5 feet 6 inches high, and 22 years of age.” The prisoners had him in charge, stripped and cruelly treated him. They had dogs, accustomed to the pursuit of fugitives, and had doubtless apprehended the deceased as a runaway. Though the fact is not particularly reported in this case, it would seem to be a just inference from its history. Was this evidence sufficient to sustain the allegation 1 Independent of the strong corroboration which the occasion afforded, the arrest and possession, the conduct of the prisoner as well as that of the deceased, this Court concurs in the opinion expressed by the presiding Judge, that the fact of color was prima facie enough to show that the deceased was a slave.
In this State, the existence of two distinct races and conditions has furnished a rule on this subject. This has been incorporated in our legislation and adjudged cases, and has been long and universally acted upon. The distinction is founded on color, and the presumption of freedom or slavery goes with it. Although the A. A. 1740 has been referred to, and much commented on in this case, the rule, I. presume, had its foundation in the introduction of African slavery, and dates from "a period whon the free negro was less common amongst us than at the present day. The earlier legislation too, with its numerous regulations in reference to “ negroes and other slaves,” according to the parlance then, will be found instructive. The preamble and the Act of 1740, (7 Stat. 397,) are alike unequivocal. The former recites that, “ whereas slavery has been introduced and allowed, and the people commonly called negroes, &c., have been deemed absolute slavesand the enactment declares that all negroes, &c., then or after in this Province, shall be, and remain forever hereafter, absolute slaves, with certain exceptions therein enumerated, with the very significant j'proviso, that if any negro, &c., shall dispute the fact of slavery, *335 the prima facie presumption shall be, that such person is a slave, and the onus of proof will lie upon him, except again and alone in favor of the Indian in amity, when the burthen shall lie with the defendant. From that day to this, I think, it may be asserted this is the presumption which arises upon the color. Though I am not aware that the question has been distinctly raised in our Courts in the present form, it has been again and again collaterally held and announced in a series of cases.
In 2 Speer, 155> (State vs. Harden, note,) it is said that “ by law every negro is presumed to be a slave. The onus of proving his freedom when questioned is cast on him.”
In 1 Rich. 318, (Nelson vs. Wetmore,) the Judge said if the occurrences had transpired where slavery did not exist, other presumptions might have arisen — but, having occurred in North-Carolina, “ there, as here, the African blood is prima facie evidence of slavery.” In 2 Speer, 129, (State vs. Brown,) the Judge, delivering the opinion of the Court, said, “ The legal condition of all persons of Hetty’s color is slavery; and it cannot be necessary to allege a knowledge of what the law presumes.”
In the case of Huger vs. Barnwell, (5 Rich. 273,) a like interpretation of the A. A. 174U was treated as a matter not to be questioned.
The restraints, as of right imposed on the liberty and actions of this class, by the white population of the country, resting alone on the presumption of color, as a matter of caution, safety and policy, are of daily occurrence ; and, when acts are done in good faith, founded on such presumption, it will always avail as a legal excuse. In this particular case, the prisoner has nothing to complain against the operation of the rule. He has been placed in no greater jeopardy, to say the least, that the deceased should be regarded as a slave rather than a freeman, and, if the remaining facts found by the jury be true, the sequel discloses the agency whereby presumptions, as to this particular ground of inquiry, could alone be had.
The second ground invites to a review of the proof of the *336 corpus delicti. Although the jury have found the fact against the prisoner, the extreme caution, recommended by humane and eminent jurists in such a case, entitle him to this review. Here no eye-witness has testified to the killing, and the mutilated remains, when discovered, afforded no means of recognition by those who had seen the deceased when living. No precise rule can be laid down, perhaps, further than that the circumstances should produce an assurance of moral certainty. These Ido not propose to re-state. They are fully stated in the brief. The painful narrative of this bloody tragedy may well satisfy the mind of any dispassionate reviewer, that on this point there is no room for a reasonable doubt. The death and identity of the body are too well established, by a train of circumstances, to justify a disturbance of the verdict on this ground.
The third ground, that the evidence reduced the charge, from murder to killing in sudden heat and passion, requires but a passing remark. However lawful the pursuit and apprehension of a fugitive slave, the conduct of this prisoner, and of his associate in guilt, affords an exhibition of a wicked purpose and gross recklessness of human life, rarely met with. The brief is examined in vain for any evidence of provocation on the part of their unfortunate and unoffending victim, or for the usual indications of a mere purpose to reclaim and restore a runaway to his rightful owner. The extraordinary and dangerous agencies used in the original capture, the cruel and protracted abuse of the slave when in their power and possession, preclude all such extenuation, sought to be inferred, in the absence of proof, because of an alleged attempt to escape. However such disclosures may awaken the bitter invective and calumny of ignorant and deluded opposers of our institutions, such means, for such an end, will never find vindication nor excuse amongst ourselves.
The fourth ground complains that part of the confessions of Blackledge, (the other party implicated,) was permitted to go the jury. His confessions were made by persuasion, and the hope of immunity, but the narration was stopped on objection. *337 The witness was permitted to state the fact, that he found the bones of a negro man, as he believed, in the swamp, behind a log, &c. ; with the additional fact, that they were found by Blackledge’s direction. The fact of discovery was clearly competent, no matter by what agency. The law is clear that, although such confessions are to be excluded as a whole, yet, when, in consequence of information obtained from the prisoner, any material fact is discovered, it is competent to show that such discovery was made conformably with the information given. (1 Green. Ev. § 231.)
The reason of the rule is obvious — confessions, induced by hope, or extorted by fear, are delusory; they may be and often are false — but, when the fact discovered shows so much of the statement true, the reason for the exclusion ceases. In this case, a guilty participation, in acts of violence to the slave, was shown against each. The prisoner and Blackledge were of the same party, and engaged in the same unlawful enterprise. On the trial of the prisoners, it was competent to show the acts of Blackledge, otherwise a severance would lead almost invariably to an evasion of justice.
If Blackledge had shown these remains, or, had been traced to the spot when engaged in an effort to conceal them, by one on the watch, or, if a dog, even of one of them, had retraced the spot and disinterred the remains, either fact would have been competent in this investigation — any act of Blackledge’s, showing his knowledge of the locality of these remains, was competent. This did not necessarily implicate the prisoner; but, the fact that one, charged as an accomplice, gave information, which led to the discovery, was one in a chain of circumstances entitled to be heard and competent.
I have thus disposed of the grounds taken for a new trial.
This Court has felt that the gravest consideration is due, whenever the life of a human being is involved.
Such consideration has been bestowed on the prisoner’s case, and finding no proper ground on which to remand his case to another jury, his motion for a new trial must fail.
*338 It is therefore ordered that the motion of the prisoner, Thomas Motley, for a new trial, be dismissed.
O’Neall, Wardlaw, Withers, Glover and Munro, JL, concurred.
In Blackledge’s case, the opinion of the Court was also delivered by
Whitner, J.
The consideration, which has been given to the several grounds of appeal, in the case of Thomas Motley, dispenses with the necessity of considering such of them, in this case, as involve the same questions.
The first ground, in arrest of judgment, raises an objection to one of the grand jurors, composing the panel which returned the bill of indictment.
I shall not discuss the character of the objection, or the manner in which it is now presented, or the effect that the disqualification of a single juror, in such a panel, might have, without reference to other facts that might claim consideration.
The view, entertained by this Court, disposes of the objection, on the general ground that, after arraignment, trial and verdict, it comes too late to avail the prisoner. The infrequency of such an objection has enabled me to derive but little aid from adjudged cases, there being none, of which I am aware, in our own State.
It must be conceded, however, as a part of our fundamental law, that “ no man’s life can be taken away by judicial proceeding, but by the judgment, on oath, of twenty-four men, at the leasta grand jury must accuse, twelve, at least, of whom, must concur in finding the bill of indictment; a petit jury, consisting of twelve, must concur in finding the truth of the fact of which the prisoner is accused, before a verdict of guilty can be rendered. These, with other protections which are thrown around the prisoner by the law, must be held inviolate. So, too, it is to be conceded that grand, as well as petit jurors, ought to be prodi et legales homines. Well-founded objections, im *339 pugning these essential safeguards, are entitled to, and must receive just consideration, when presented at the proper time. It has been held that such an objection is too late, as to a petit juror, after verdict. (State vs. Slack, 1 Bail. 330 ; State vs. Williams, 2 Hill, 381.)
The argument is, that the case is not analogous. That special opportunity, by the forms of proceeding, is afforded for objection, and so the accused specifically advertised. But this extreme caution is founded in the humanity of the law, and is well suggested by the graver consequences that attach as the cause thus proceeds to trial. The inquiry by the grand jury, however important and essential, is ex parte and preliminary. The great ends to be attained are, doubtless, to bring the guilty to punishment, and protect the innocent from the annoyance of false accusation. But, although the law has interposed this safeguard, independently of the defendant’s knowledge as to the individuals who compose the grand jury, or, it maybe, even of the fact of its organization at the time, this cannot be said up to the time of the trial. He is entitled to a copy of the indictment, as well as a list of the array who may be called to pass upon his trial, three days before it. He has, therefore, the means of information, and must take the consequences of an omission to avail himself thereof. The proper time, thérefore, to urge an objection of the kind in question, must be when called to plead to the indictment. By special plea, or other suggestion to the Court, before proceeding to the trial, such objection would assuredly secure consideration. Cases, in the English books, bearing on this point, may be found, though of rather rare occurrence. (31 St. Trials 543 ; 3 Inst. 34; Cro. Car. 134, 147; 1 Jones, 198.)
The second ground refers to an amendment of the verdict, directed to be made by inserting the name of the defendant, he having, in the verdict first announced, been designated as “The Prisoner.” The amended verdict was‘signed by the foreman and published in the presence of all the jury before they had left the box. The consent and approval of the jury was mani *340 fest. The effect of the amendment was simply to furnish that designation by a reference to the verdict alone, which was susceptible of ascertainment by reference to the whole record of the proceeding, amounting to a certainty that well might have precluded any benefit or advantage to the prisoner, had it remained. Be this as it may, the amendment was in accordance with the practice of many years, and never, perhaps, called in question since the decision in State vs. Yancy, (3 Brev. 142.) In that case the amendment was permitted, some days after the verdict had been rendered, though certainly the better practice is to amend before the dispersion of the jury or any entry on the journal.
The sixth and seventh grounds question the sufficiency of the proof, as to the name of the negro, and as to reasonable diligence in discovering the name of the owner. The verdict of the jury is perhaps quite a sufficient reply as to both points. The proof, necessary to ascertain the true name of a slave, or the diligence, required, to be deemed reasonable in the effort at discovering the name of the owner, may not well be subject to any very intelligible rule. The slave seems to have been called and known by the name, alleged in the indictment, by the party having him in custody, of whom the prisoner was one. That, on an occasion of that sort, he was called and answered by such name, would seem quite sufficient primafacie, the name in this investigation being used but as a means of designating the slave referred to. The other averment would have been fatal, if the proof had been that the name of the owner was known. The negative is of difficult proof — the affirmative would have availed the prisoner. That it was not had was at least some indication that it could not be had. But it may be observed, that the mutilated remains of the deceased furnished little prospect of discovery, as the means of recognition were thereby effaced. The rule may well be relaxed under such circumstances, especially when the act was traced to the hand of the accused.
No other grounds have been relied on in this case, except such as were substantially presented in the former case, and, *341 they being ruled unfavorably to Motley, the same result follows in this case also.
It is therefore ordered, that the motions of the prisoner, William Blackledge, in arrest of judgment, and for a new trial, be dismissed.
O’Neall, Wardl aw, Withers, Glover and Munro, JJ., concurred.

Motions dismissed.